IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


AUGUSTINE GRANADO,

       Plaintiff,

  vs.                                    No. CIV 05-21 JH/LFG

ADDUS HEALTHCARE, INC.
and DON D. DOUGLAS,

       Defendants.


## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION [1]

### Procedural Background

This is a *pro se, in forma pauperis* civil rights action bought by Plaintiff Augustine Granado

("Granado") under 42 U.S.C. § 1983.  Granado, an inmate at Lea County Correctional Facility

("LCCF"), originally filed his complaint in New Mexico District Court.  The action was removed to

this Court on Defendants' Notice of Removal [Doc. 1], dated January 10, 2005.  Granado alleges in

his complaint that Defendants violated his constitutional rights by failing to provide adequate medical

care for his eye condition while he was incarcerated at LCCF.

On February 17, 2005, the Court issued a Memorandum Opinion and Order [Doc. 9],

dismissing defendants Joe Williams and the New Mexico Corrections Department from the case.  The

---

[1] **Within ten (10) days after a party is served with a copy of this legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.**

remaining two Defendants filed their Answers (to which Plaintiff filed replies), and the Court

thereafter ordered that Defendants file a Martinez Report pursuant to Martinez v. Aaron, 570 F.2d

317, 320 (10th Cir. 1978).  The parties were notified that the Martinez Report could be used in

deciding whether to grant summary judgment on Plaintiff's claims, and that the parties should submit

whatever materials they consider relevant to the claims  [Doc. 18, at 3].

Defendants filed their Martinez Report [Doc. 20], along with exhibits, on July 6, 2005.

Plaintiff did not initially file a Response to the Martinez Report, and on September 19, 2005,

Defendants notified the Court of this and asked that summary judgment be granted in their favor

based on Plaintiff's failure to respond [Doc. 21].  Shortly thereafter, Plaintiff filed his Response [Doc.

22] and Defendants then renewed their request for summary judgment, arguing that Plaintiff's

Response was not only late but also failed to set forth any evidence in opposition to Defendant's

motion for summary judgment [Doc. 23].

The Court agrees that Plaintiff's Response was filed beyond the deadline set forth in the

Court's order.  However, the Court will in its discretion accept the document for late filing.  The

Court has now reviewed the filings, including the Martinez Report, Granado's Response, and

Defendant's Reply, construed the *pro se* pleadings liberally, holding Plaintiff to a less stringent

standard than that required of a party represented by legal counsel, Haines v. Kerner, 404 U.S. 519,

520-21, 92 S. Ct. 594, 596 (1972); Gillihan v. Shillinger, 872 F.2d 935, 938 (10th Cir. 1989), while

bearing in mind that this legal construction does not relieve Plaintiff of his burden of presenting

sufficient facts to state a legal claim.  Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

Defendants ask the Court to grant them summary judgment in light of the evidence and arguments

presented by the parties, and the Court finds that this matter is now ripe for resolution.

**Discussion**

Pursuant to Fed. R. Civ. P. 56(c), the Court may grant summary judgment if the pleadings, affidavits, and exhibits show there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  The opposing party must be given notice and an opportunity to respond, as provided in Rule 56.  Hall v. Bellmon, at 1111.

Legal Standard for Summary Judgment

Having submitted a Martinez Report and having the asked the Court to grant summary judgment in their favor, Defendants carry the burden of establishing that there is no genuine issue of material fact.  They may discharge this burden by showing there is an absence of evidence to support Plaintiff's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).  Once Defendants meet their burden, the burden shifts to the Plaintiff to demonstrate a genuine issue for trial on a material matter.  Bacchus Indus., Inc v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

The party opposing the motion may not rest on his pleadings, mere argument or contention, but must set forth specific facts showing there is a genuine issue for trial as to those dispositive matters on which he carries the burden of proof.  Summary judgment is appropriate if there is insufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986); Celotex Corp., 477 U.S. at 324.  For the reasons given below, the Court finds that Defendants have met their burden and recommends that summary judgment be entered in favor of Defendants on Plaintiff's claims.

Legal Standard for Eighth Amendment Claim

Plaintiff states in his complaint that he is going blind and that Defendants subjected him to

3

cruel and unusual punishment in violation of the Eighth Amendment by refusing to allow him to have

Lasik eye surgery which he alleges would preserve his sight.[2]

Under certain conditions, denial or delay of treatment by prison medical personnel can

constitute cruel and unusual punishment in violation of the Eighth Amendment. Estelle v. Gamble,

429 U.S. 97, 104-05, 97 S. Ct. 285, 291 (1976). "In order to state a cognizable claim, a prisoner

must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious

medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation

of the Eighth Amendment." Id., 429 U.S. at 106.

The "deliberate indifference" standard has two components, one objective and one subjective.

Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321 (1991). In order to recover, Plaintiff must make a

two-part showing: (1) that the medical need was "sufficiently serious," and (2) that the offending

officials acted with a culpable state of mind in that they knew or must have known about the serious

medical need by intentionally refused to provide medical care. Farmer v. Brennan, 511 U.S. 825,

834, 114 S. Ct. 1970, 1977 (1994).

A "serious" medical need is one involving a life-threatening situation, or an instance in which

it is apparent that delay would exacerbate the prisoner's medical problem, or could result in lifelong

handicap or permanent loss. A delay in medical treatment does not violate a prisoner's constitutional

rights unless he can show that the delay resulted or will result in substantial harm. Olson v. Stotts,

9 F.3d 1475, 1477 (10th Cir. 1993); White v. Colorado, 82 F.3d 364, 366 (10th Cir. 1996). And

---

[2] Plaintiff also refers in various pleadings to the New Mexico Tort Claims Act. Without deciding whether he has adequately stated a claim under this statute, the Court finds that any such claim is precluded by Plaintiff's failure to establish that he exhausted his administrative remedies under the statute by filing a notice of tort claim prior to filing suit. N.M.S.A. (1978) § 41-4-16.

"intentional refusal" is more than a negligent diagnosis or an inadvertent failure to provide medical care; rather, Plaintiff must show a "culpable state of mind" to support his claim of denial of a constitutional right.  Id., at 367; Handy v. Price, 996 F.2d 1064, 1067 (10th Cir. 1993).

The Court finds that Granado has not raised a genuine issue of material fact as to a "serious" medical need, nor as to the requisite culpable state of mind on the part of the Defendants.

### Factual Background

Granado's prison medical records indicate that he suffers from a number of medical and psychological conditions, aside from his eyesight, and that he takes numerous medications.  The non-vision related conditions include depressive disorder, anxiety, schizoaffective disorder,  substance dependence, antisocial personality disorder, headaches, insomnia, hallucinations, paranoia, digestive disorders, skin conditions, and hyperlipidemia.  [see, Martinez Report, Ex. B ("MR-B")].[3]

Granado entered the New Mexico corrections system in February 1998, expecting to serve a sentence of 78 years to life.  He was wearing glasses at the time he was received at the Western New Mexico Correctional Facility.  [MR-A 6].  There is no indication in his intake records that he was suffering from a serious medical need involving his eyesight at this time, nor that he was in danger of going blind.

On February 13, 2003, before arriving at LCCF, Granado received a pair of glasses, at state expense, from the corrections system.  He signed a form stating he found the glasses to be "satisfactory to me."  [MR-A, at 369].  Granado was transferred to LCCF on or about August 24,

---

[3] Plaintiff's prison medical records are voluminous.  Defendant attached the medical records as Exhibit A to the Martinez Report.  Exhibit A is numbered continuously from front to back, pages 001-430.  The Court will hereinafter refer to the medical records in the format, "MR-A 6," to represent Martinez Report [Doc. 20], Exhibit A, at p. 6.  Exhibits other than Exhibit A will be referred to in the format "MR-B," "MR-C," etc.

2003.  [MR-G].  Three days after his transfer to LCCF, on August 27, 2003, Granado submitted a Health Service Request Form, complaining of migraine headaches and anxiety.  He was seen by a health care provider the next day.  The provider took his vital signs and noted "Perrla" [MR-A 60] which, Defendant says, refers to an eye examination and indicates that Granado's pupils were at that time "equal, responsive, and reactive to light and accommodation."  [Doc. 20, at 3].  Plaintiff does not dispute this characterization, and the Court accepts it.

On September 18, 2003, Granado was seen by a prison health care provider with complaints of headaches, off and on, for the past 4-5 years.  The provider noted that Granado had suffered multiple head injuries in the past.  Granado told the provider that his glasses were "OK" but that his headaches were worse with sunlight.  The practitioner noted "Perrla" again (see above), and recommended sunglasses or tinted lenses for help with the headaches.  He referred Granado to the optometrist "when due."  [MR-A 61].

On November 19, 2003, Granado submitted a Health Service Request Form in which he stated, "My eyes burn & itch when exposed to direct light.  I also get headaches."  There is no mention in this request of impending blindness or the necessity for eye surgery.  He was seen by a nurse on November 21.  The documentation notes that Granado told the nurse, "I read in the PDR that Clonidine makes my eyes sensitive to light."  The nurse noted that Granado's last optometry visit was in January of that year, and that new glasses had been ordered at that time.  The nurse made a note to check on the possibility of getting tinted glasses for Granado.  [MR-A 66].  At Granado's "Annual Health Maintenance" check two days later on November 23, the vision in both of his eyes was noted as normal.  [MR-A 12].

Granado received a full physical exam on December 23, 2003 from Dr. Roger Hill, the

6

Medical Director at LCCF.  Dr. Hill examined Granado's eyes and noted that his pupils, lids, and ocular movements were normal, with full visual fields.  [MR-A 22].  Dr. Hill further noted that an appointment was made with the optometrist for help with the "photophobia" Granado was having with his current glasses.  [MR-A 23].  In a Chronic Disease Note dated January 28, 2004, a health care provider (the signature appears to be Dr. Hill's) noted that Granado had an upcoming optometry appointment for his photophobia and headaches, and the provider also noted "?[possibly] inappropriate glasses." [MR-A 69].

This optometry appointment apparently had not taken place by February 17, 2004, when Granado submitted a Health Service Request Form, stating, "My vision is failing.  Bright light bothers me.  I get headaches. Dr. Hill has offered me twice to see the eye doctor.  The first time was a month and a half ago.  The second, 2 weeks ago.  My vision sometimes blurs bad.  I can barely see to read or quilt[?]."  He was seen by a nurse the next day, who noted that Granado stated his vision was getting worse and that he had not been seen by an optometrist.  The nurse spoke with Dr. Hill, who said it was not necessary for Granado to be seen offsite, so he was placed on the list to see the optometrists "ASAP."  [MR-A 70].

By March 3, 2004, Granado had, apparently, still not been seen by the optometrist.  He wrote a letter to Defendant Don Douglas, stating that he had been given referrals to optometry but had never been seen.  He wrote, "My eye sight is really getting bad.  Sometimes I feel I am experiencing snow blindness. Every thing just meshes together.  I can't see details.  I'm afraid I'm going blind. Your assistance would be greatly appreciated."  [MR-A 376].  There is no written response from Douglas to Granado in the record; however, Granado was scheduled to see the optometrist on March 10, 2004.  He did not show up for his appointment [MR-A 71], but Granado's unit was locked down

7

at the time of the appointment, which explains his absence [MR-A 72], and Defendants state that

there is no evidence that Granado was at fault for the lockdown.  [MR 4, 9].

A week later, on March 17, 2004, Granado submitted a Health Service Request Form in

which he noted that he felt his vision was failing, that he was having a hard time seeing up close, that

he was experiencing what seemed like snow blindness, and that when he is in the sun he gets

headaches and his eyes water profusely.  He was referred to optometry.  [MR-A 72].  On March 20,

2004, Granado was seen by optometrist Dr. Clay Reeber.  Dr. Reeber noted that Granado's ocular

health was good but he diagnosed Granado with astigmatism (a condition causing blurred vision)[4] and

hyperopia (farsightedness)[5].  He wrote Granado a new, stronger prescription for eyeglasses.  [MR-A

302-304].  The order for the prescription was sent to Wilson Optical lab that same day, with

directions that it be filled "ASAP."  [MR-A 304].  Granado received his new glasses ten days later,

on March 30, 2004.  [MR-A 377].

On June 3, 2004, Granado filed a grievance which reads, "Medical refuses to have Lasics [sic]

Surgery done on my eyes.  Without this surgery I will go blind.  I have asked the eye doctor for this

surgery, but he says it's unavailable to inmates."  His requested relief is that "the surgery be done

ASAP."  [Complaint, Exhibits (unnumbered); MR-D].[6]  This grievance was the first time Granado

---

[4]Dorland's Illustrated Medical Dictionary 131 (26th ed. 1981).

[5]Id., at 633.

[6]Defendants state in their Martinez Report [Doc.20, at 5 n.1] that the exhibits attached to Granado's complaint indicate that he prepared a separate grievance on June 3, 2004 (which appears as the first page of the exhibits attached to the complaint) in which he complains of the same problem in slightly different language, and that he never filed that grievance.  The grievance that he did file, quoted above, is dated at one place 6-3-04, and at another as 6-3-03.  The latter date is obviously a misprint for 2004; Defendant so alleges and Granado does not dispute this.

requested Lasik surgery for his eye condition.  [Affidavit of Don D. Douglas, MR-G].  The June 3, 2004 grievance was accepted for consideration on June 21, 2004, and on July 22, 2004, the grievance officer recommended that it be denied, a recommendation followed by the Warden.  [Id.].

On August 5, 2004, Granado appealed the grievance decision, stating, "I have been medically and professionally informed by a specialist that without said eye surgery I will go blind within a very few years.  This issue has not been addressed either by medical personnel or the grievance officer here at LCCF."  [Id.].  There is no indication on the record that Granado provided the name of the medical specialist who informed him that he would go blind without the surgery, and he has not supplied the Court with this name, nor with any documentation of this allegation.

The grievance appeal was denied on August 31, 2004, the  Deputy Secretary Operations at the Corrections Department noting, "The initial investigation indicates that you have been and will continue being provided with the appropriate health care for your medical condition.  Your grievance appeal has failed to provide any evidence to support your claim; therefore this grievance appeal is denied."  [Id.].

Meanwhile, on August 5, 2004, Granado submitted a Health Service Request Form, asking to see the eye doctor about getting "transition lenses."   He noted that a Dr. Murin (otherwise unidentified) told him that the psychotropic medication he was taking made his eyes sensitive to light. Granado did not say anything in this Request about feeling he was going blind nor about having been advised to have eye surgery.

Granado was referred to optometry as a result of this request.  [MR-A 80].  On September 4, 2004, Granado was seen by the optometrist, Dr. Reeber.  Dr. Reeber noted that Granado was complaining of photosensitivity.  He stated in his examination notes that Granado had hyperopia and

astigmatism, but that his general ocular health continued to be good.  He noted a change in Granado's

prescription, stating that a new prescription was optional.  [MR-A 305].  New glasses were ordered

for Granado, and he received them sometime in September 2004.  [MR-A 306, 24].

On February 22, 2005, Granado submitted a Health Service Request Form complaining of,

among other things, the fact that his vision was blurring and he couldn't read letters on the television

from ten feet away.  A nurse tested Granado's vision and found that, with glasses, it was 20/25.

[MR-A 391].  Dr. Reeber states that 20/25 vision is not quite perfect but is very good, and therefore

there was no reason to refer Granado to an optometrist at that time.  [MR-F, at ¶ 12].

On May 4, 2005, Granado submitted a Health Service Request Form, stating that he was

supposed to have been scheduled to see the eye doctor two months previously.  He continued, "My

eyes are really sensitive to light and it gives me headaches to be under bright lighting.  My vision is

also blurring."  [MR-A 388].  Again, Granado did not say in this Request that he felt he was going

blind nor that he had been advised to have surgery in order to prevent this.

Granado was seen by the optometrist on June 11, 2005.  He stated that he was suffering from

photosensitivity but that his vision was "not a problem."  He was given a new prescription for glasses

with a 30% grey tint.  [MR-B].

Defendant Don D. Douglas and Dr. Clay Reeber submitted affidavits, which are attached to

the Martinez Report as Exhibits G and F, respectively.  Dr. Reeber, who is Granado's optometrist

and treats him regularly at LCCF, stated in his affidavit that he prescribed eyeglasses for Granado to

correct his hyperopia and astigmatism.  He stated further that there is no medical reason why the

glasses he prescribed for Granado would not correct these two conditions and that while Lasik

surgery can correct these conditions in some patients, it is not more effective than prescription

10

eyeglasses and can sometimes be less effective.  The surgery is merely an alternative form of

treatment, he said, and is an elective procedure which, unlike treatment with eyeglasses, is invasive.

Dr. Reeber stated further that Lasik surgery generally costs between $2,000 and $5,000.  Because

the conditions that Lasik surgery can correct are also treatable with corrective lenses, with equal or

better efficacy, and since Lasik surgery does not cure or prevent blindness, the surgery has never been

provided to LCCF inmates to Dr. Reeber's knowledge.  [MR-F].

Dr. Reeber noted further in his affidavit that Granado has not been diagnosed with blindness

or impending blindness during his stay at LCCF, nor at any other time to Dr. Reeber's knowledge.

He examined Granado on June 11, 2005 and tested his eyesight.  He stated that, in his professional

opinion, Granado is not in danger of going blind, that his glasses sufficiently correct his vision, and

that there is no need for Lasik surgery.  [Id.].

Don D. Douglas stated in his affidavit that Defendant Addus Healthcare provided health care

services to LCCF inmates from the time of Granado's arrival at LCCF until June 30, 2004, when

Wexford Health Sources, Inc. assumed that role.  He stated further that no medical professional

associated with LCCF, Addus, or Wexford has ever diagnosed Granado with blindness or impending

blindness, and that Lasik surgery has never to his knowledge been provided to LCCF inmates because

the conditions corrected by Lasik can just as easily be corrected with glasses.  [MR-G].

<u>Plaintiff Failed to Raise Genuine Issues as to the Elements of His Claim</u>

As noted above, Plaintiff's claim of an Eighth Amendment violation includes two elements:

(1) that his medical need was "sufficiently serious," and (2) that the offending officials acted with the

requisite culpable state of mind.

The Court finds there is no genuine issue of material fact as to the seriousness of Granado's

medical condition.  The only evidence on the record as to the condition of Granado's ocular health and eyesight is that he suffers from farsightedness and astigmatism, correctable by prescription eyeglasses.  Granado states that a medical professional told him that he was going blind and that Lasik surgery could prevent this; however, he provides no other documentation of this aside from his own statements.  Dr. Reeber, an optometrist who treats Granado regularly, states that it is his professional opinion that Granado is not going blind, and that Lasik surgery is not recommended for his condition and would not prevent blindness in any event.  Granado has submitted no evidence to contradict this statement.  The Court finds that Granado has not made out a case for the jury as to the existence of a serious medical condition.

The Court finds, in addition, that Granado has failed to raise a genuine issue of fact as to any deliberate indifference on the part of Defendants.  Rather, the record shows that Granado's complaints of eye troubles have been taken seriously and that he has received appropriate medical care.  LCCF officials have responded reasonably promptly to his requests for medical care and he has received several eyeglass prescriptions, as well as tinted lenses, during his stay at LCCF.  The only medical evidence on the record is to the effect that prescription eyeglasses are the appropriate treatment for Granado's farsightedness and astigmatism, and that the Lasik surgery he requests would not be more effective and, indeed, is an invasive procedure which has the risk of producing a less desirable result than the eyeglasses.  The Court finds no deliberate indifference in LCCF officials' treatment of Granado's eye condition.

## Conclusion

Summary judgment should be entered in favor of Defendants, because there is no genuine issue of material fact requiring that the case proceed to trial.  The order directing submission of a

12

Martinez Report gave the parties notice that the Report could be used in deciding whether to grant summary judgment of Granado's claims. Defendant asks the Court to enter summary judgment in its favor and, indeed, "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. at 326.

The Court finds that the medical treatment Granado received at LCCF did not violate constitutional standards. Rather, the record as a whole indicates that he received appropriate medical care for his condition and that no reasonable jury could find otherwise. "[T]he Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain' . . . or are grossly disproportionate to the severity of the crime." Rhodes v. Chapman, 452 U.S. 337, 346, 101 S. Ct. 2392, 2399 (1981).

Plaintiff fails to meet this exacting standard, and summary judgment is therefore appropriate on his claims.

## **Recommended Disposition**

That summary judgment be entered in favor of Defendants and the case be dismissed with prejudice.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge

13